UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RUBEN TRONCOSO, | ) | Civil No. 12-1708-WQH(WVG) |
| Petitioner, | ) ) | REPORT AND |
| | ) | RECOMMENDATION DENYING |
| v. | ) | PETITION FOR WRIT OF HABEAS |
| | ) | CORPUS |
| DAVID LONG, Warden, | ) | |
| Respondent. | ) ) | |
| | ) | |
| ——————————————— | ) | |

I

<u>INTRODUCTION</u>

Ruben Troncoso (hereinafter "Petitioner"), a state prisoner proceeding *pro se*[1], has filed a Petition For Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) David Long (hereinafter "Respondent"), filed a Motion to Dismiss the Petition. (Doc. No. 13.) Petitioner then filed an Opposition to the Motion to Dismiss. (Doc. No. 18.) The Court ordered Respondent to file a Reply to Petitioner's Opposition to the Motion to Dismiss. Respondent then filed a Response To Petitioner's Opposition to Respondent's Motion To Dismiss. (Doc. No. 20.) Petitioner filed a Reply to Respondent's Response. (Doc. No. 22.) This Court issued a Report and Recommendation

---

[1] Petitioner filed his Petition *pro se*. However, he is now represented by counsel who filed Petitioner's Opposition to Respondent's Motion to Dismiss and Traverse on his behalf.

("R&R") to Judge Hayes recommending that Respondent's Motion to Dismiss be granted. (Doc. No. 23.) Respondent then filed a Motion to Expand the Record and for Judicial Notice, in addition to an Objection to the Report and Recommendation. (Doc. Nos. 24-25.) Judge Hayes adopted the Report and Recommendation in part and did not adopt it in part as to the Motion to Dismiss. (Doc. No. 26.) Following Judge Hayes' ruling, this Court ordered Respondent to respond to the Petition and ordered Petitioner to file a Traverse. (Doc. No. 27.) Respondent filed an Answer to the Petition for Writ of Habeas Corpus. (Doc. No. 29). Subsequently, Petitioner filed the Traverse. (Doc. No. 31.)

Petitioner's single claim is that his appellate counsel was ineffective for failing to raise instructional error as to the California Health & Safety Code § 11370.4[2] weight enhancements, arguing that the enhancements were illegal because the jury was not instructed that he had "substantial knowledge in the weight of the cocaine." Petitioner argues that: 1) the state appellate court's denial of Petitioner's ineffective assistance of counsel claim was contrary to and an unreasonable application of federal law because § 11370.4 does not require proof of knowledge of the weight of the cocaine; 2) the state appellate court erred when it did not address Petitioner's claim that due process requires a *mens rea* requirement for statutory criminal offenses that the legislature did not intend to be regulatory; and 3) since appellate counsel failed to raise the knowledge issue, the state appellate court unreasonably applied <u>Strickland v. Washington</u>. 466 U.S. 668 (1984).

The Court, having reviewed all of the pleadings in this case and the lodgments presented therewith, finds that Petitioner did not receive ineffective assistance of counsel. Therefore, the Court RECOMMENDS that Petitioner's Petition be DENIED.

---

[2] All references to code sections are to the California Health & Safety Code, unless otherwise noted.

## II

## FACTUAL BACKGROUND

The following statement is taken from the California Court of Appeal opinion, People v. Tronsco, No. D054675, slip. op. (Cal. Ct. App. June 96, 2010). (Lodgment 22 at 1.) "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041 (2003); see also 28 U.S.C. § 2254(e)(1). The facts as found by the California Court of Appeal are as follows:

Starting in May 2005, and for approximately 20 months, El Centro Police Detective Robert Sawyer worked with the Drug Enforcement Agency (DEA) to investigate the Sinaloa drug cartel, led by Victor Emilio Cazares, which imported cocaine from Mexicali, Mexico into the United States. The cocaine was stored in a Mexicali warehouse until delivered to a cell or branch of the organization operated by Carlos Cuevas, Jr. for transporting it into the United States. The goal of the Cuevas cell was to import as many packages of cocaine as possible from Mexico into the United States, and they hired several drivers and vehicles, who transported approximately 400 packages weekly.

Carlos Valle's work for the cartel was to retrieve the cocaine from the warehouse, package it, place it in hidden compartments in passenger vehicles and turn the vehicle over to drivers to transport it into the United States. He coordinated with Cuevas by phone, and used a separate phone to communicate with the drivers. Usually, the driver from the United States took his vehicle to an automobile parts store or a grocery store parking lot in Calexico, park it and walk away from it. Valle would pick up the vehicle, drive it to a ware-house where the narcotics were stored, load it with narcotics and

12cv1708

return it to the parking lot for the driver to pick it up and return to the United states. This was done to prevent the driver from knowing where the narcotics were stored in Mexico. Detective Sawyer testified, 'It was very rare that Cuevas would directly speak to the driver or meet the driver.' The separation between Cuevas and the drivers was maintained because 'if a driver was stopped by law enforcement prior to making the delivery, such as the port of entry or traffic stop, the driver of the vehicle who obtained the narcotics would not be able to tell law enforcement about the hierarchy of the organization. They wouldn't be able to tell what other vehicles were utilized, who else they worked for, who the ultimate owner of the cocaine was.'

Luis Kaiser, Cuevas' assistant, was 'responsible for locating drivers, negotiating payment for the drivers, providing the vehicles that were purchased by the Cuevas organization to the driver and acting as a go-between.' Detective Sawyer testified that although the driver was on the lower level of the organizational totem pole, '[t]he driver is an extremely important role; it makes the transportation of the cocaine possible.' Without the drivers, the product could not be delivered and payment cannot occur. The payment was for the product's delivery from Mexicali to Los Angeles to the customer. The cargo transported was valuable to the cartel, which was always meticulous about keeping an accounting and assigning responsibility for lost goods.

[Petitioner] worked with the organization from approximately June or July 2005 to October 2005. He was one of several drivers of narcotic-laden vehicles. [Petitioner] and the other drivers were typically paid $3,500 per trip plus $200 for gasoline and expenses. If the drivers needed to stay overnight in Los Angeles, they were

4

reimbursed for their hotel bills. [Petitioner's] reputation in the Cuevas cell was for being slow in making his deliveries. Although Petitioner's superiors wanted quicker deliveries, they recognized that [Petitioner] was able to successfully elude law enforcement because of his counter surveillance driving. Detective Sawyer testified [Petitioner] was 'extremely trusted; it appeared that he was reliable with this organization,' so much so that he was exempted from the Cuevas cell's usual practice of having a driver assigned to him to follow his drug-laden vehicle on the entire trip in order to ensure that the delivery occurred. This exemption indicated to Detective Sawyer that [Petitioner] had gained that trust because he had been involved with the cell for a long time.

During the operation, law enforcement authorities intercepted approximately 80 telephones, most belonging to Cuevas. Detective Sawyer observed, 'Phones appear to be the lifeline for this organization. That was how they determined where the cocaine was going to be delivered to, what vehicles were going to be utilized to deliver the cocaine, which drivers would be utilized to drive those vehicles, and then who was responsible for any losses that might occur. And then there was an audit that was done on a frequent basis between Carlos Cuevas and the sources supplying Sinaloa . . . and then there would be a corresponding conversation where they would discuss the distributer or the customer that received that cocaine and what was received so they could audit the books and make sure that – for example, 50 kilograms were delivered by one driver on this date but the customer in fact received 50 kilograms on that date or the following date so they knew exactly where the cocaine was and there was accountability for that.'

12cv1708

Detective Sawyer testified that each time his team 'conducted surveillance efforts as a result of our intercepted communications through the court intercepts or the court-authorized wiretaps, we followed a car, we believed the car contained narcotics, 100 percent of the time we seized narcotics as a result of those intercepts.'

On October 10 and 11, 2005, Detective Sawyer listened to intercepted phone calls between Cuevas and Kaiser and between Cuevas and Valle regarding a trip they planned for [Petitioner] to go to Mexicali and obtain a total of 31 kilograms of cocaine, which was subsequently transported to Imperial County and eventually to Los Angeles County to a person named Alithio Rios, nicknamed Pescado, and 3 kilograms to someone nicknamed Pulpo. The Cuevas cell sold approximately 2000 kilograms of cocaine a month to Rios and another individual nicknamed Gato, who were the Cuevas cell's largest distributors in the Los Angeles area.

On October 11, 2005, Detective Sawyer surveilled [Petitioner's] black Ford Expedition as it crossed the border in Calexico, California. Detective Sawyer did not cross the border. Instead, Detective Sawyer relied on his knowledge of the investigation and assumed that Valle would load [Petitioner's] vehicle as was the usual practice. Several hours after [Petitioner's] vehicle entered Mexico, Detective Sawyer observed Petitioner's vehicle return to [Petitioner's] residence at a trailer park in Imperial County, California.

On the morning of October 12, 2005, Detective Sawyer and several agents in different cars surveilled [Petitioner] as he traveled in his Ford Expedition from his residence toward San Diego. [Petitioner] used counter surveillance driving techniques to see if he was being followed. When [Petitioner] was driving through Orange County,

Torrance Police Department officers, who were more familiar with the Los Angeles area, assumed the surveillance duties. That afternoon, Kaiser telephoned Cuevas seeking directions to a meeting point with Rios, and he was given direction to a strip mall near the intersection of 'Alondra and Paramount.' Also, Cuevas telephoned Rios with a description of [Petitioner's] vehicle.

[Petitioner], following the directions given to Kaiser, eventually exited the freeway and parked in a strip mall for approximately 10 minutes, when a Toyota Camry arrived. [Petitioner] had a brief conversation with the driver, Rios, and they switched vehicles, with Rios taking [Petitioner's] Expedition to a Long Beach address and pulling into an enclosed garage. Thereafter, the Expedition left the Long Beach garage. Shortly thereafter, Rios returned to the garage in his Camry.

Based on the Torrance Police officers' surveillance, Torrance police officers obtained a search warrant for the Long Beach address.  The search yielded 31 kilograms of cocaine packaged in the Cuevas cell's distinctive manner. More cocaine was found at the Long Beach address, bringing the total of cocaine packages to 136.

On October 26, 2005, Detective Sawyer intercepted telephone calls indicating that [Petitioner] would transport 41 kilograms of cocaine in an Avalanche vehicle. The following day, Detective Sawyer passed by [Petitioner's] trailer park parking lot and observed and photographed the Avalanche parked there.

On the morning of October 28, 2005, Detective Sawyer surveilled [Petitioner] as he left the trailer park and headed on the freeway out of Imperial County. Again, [Petitioner] took counter surveillance measures, including stopping at a casino for a short while, and

12cv1708

1   resuming the trip on the freeway. Eventually, an Orange County

2   Narcotics Suppression team took over surveillance of [Petitioner].

3   [Petitioner] eventually exited the freeway in Compton, California

4   and parked by an automobile parts store. Thereafter, a Mercedes

5   Benz pulled into the automobile parts store parking lot, and [Peti-

6   tioner] spoke to the driver of the Mercedes Benz. [Petitioner]

7   followed the Mercedes Benz to a residence less than half a mile away

8   and pulled into the driveway. Approximately one hour later, the

9   Avalanche left the residence. Police searched the residence and,

10  consistent with information received via wiretaps, seized 42

11  kilograms of cocaine, a half pound of marijuana and $56,000. Police

12  testified that the cocaine's wholesale value was approximately

13  $12,500 per kilogram.

14  (Doc. No. 30-22.)[3/]

15                                    III

16                          PROCEDURAL HISTORY

17      A jury found Petitioner guilty of possession of cocaine for sale [§ 11351,

18  (counts 1, 7)]; transportation of cocaine [§11352(a), (counts 2, 8)]; transportation of

19  cocaine for sale or distribution to a non-contiguous county [§ 11352(b), (counts 3, 9)];

20  conspiracy to possess cocaine for sale [Cal. Penal Code § 182(a)(1), (counts 4, 10)];

21  conspiracy to transport cocaine [Cal. Penal Code § 182(a)(1), (counts 5, 11)]; and

22  conspiracy to transport cocaine for sale or distribution to a non-contiguous county [Cal.

23  Penal Code § 182(a)(1), (counts 6, 12)]. Counts one through six alleged acts occurring

24  on October 12, 2005. Counts seven through twelve alleged acts occurring on October

25  28, 2005. (Doc. No. 1 at 19).

26

27  _____

28  [3/] The Court's ECF document numbers are cited in lieu of lodgment numbers to simplify referencing the
documents, due to the numerous volumes of lodgments and duplicate lodgments submitted to the Court.

It was further alleged as to Counts one through six that the amount of cocaine exceeded 20 kilograms by weight within the meaning of Section 11370.4(a)(4), and as to Counts seven through twelve that the amount of cocaine exceeded 40 kilograms by weight within the meaning of Section 11370.4(a)(5). (Doc. No. 1 at 19-20). The jury found Petitioner guilty of all twelve counts and found all the weight enhancement allegations true. (Id. at 20).

Petitioner was found guilty on all counts. The trial court sentenced Petitioner to 33 years imprisonment, but awarded him 729 days of actual custody credits plus 364 conduct credits pursuant to Cal. Penal Code § 4019, for a total of 1,093 days of pre-sentence credits. (Doc. No. 30-22 at 1-2.)

Petitioner appealed his convictions to the California Court of Appeal. (Doc. No. 30-22.) On July 29, 2010, the Court of Appeal reversed Petitioner's convictions on counts 2, 4, 5, 6, 8, 10, 11 and 12, but otherwise affirmed the trial court's judgment. (Id. at 22-23.) The sentence did not change as a result, but the Court of Appeal remanded the case to the trial court to recalculate Petitioner's pre-sentence custody credits according to the amended version of Cal. Penal Code § 4019, amend the abstract of judgment, and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. (Id. at 23).

On August 7, 2010, the California Court of Appeal modified its July 29, 2010 opinion, but stated: "There is no change in the judgment." (Doc. No. 30-24.)

On October 6, 2010, the Imperial County Superior Court filed an Amended Abstract of Judgment in which it recalculated Petitioner's pre-sentence custody credits. (Doc. No. 13-15.)

Petitioner did not file a Petition for Review in the California Supreme Court. (Doc. No. 13-4.)

12cv1708

On August 10, 2011, Petitioner constructively[4/] filed a Petition For Writ Of Habeas Corpus in the California Court of Appeal. (Doc. No. 13-5.) On August 22, 2011, the Court of Appeal denied the Petition, stating that Petitioner failed to file the Petition in the appropriate court. (Doc. No. 13-6.)

On September 16, 2011, Petitioner constructively[5/] filed a Petition for Writ of Habeas Corpus in the Imperial County Superior Court. (Doc. No. 13-7.) On November 8, 2011, the Petition was denied as untimely. (Doc. No. 13-8 at 2-3.)

On December 6, 2011, Petitioner constructively[6/] filed another Petition For Writ Of Habeas Corpus in the Imperial County Superior Court. (Doc. No. 13-9). On January 11, 2012, the Superior Court denied the Petition for Petitioner's failure to provide a declaration to support his explanation for his delay in filing the Petition and for failure to move for reconsideration of the November 8, 2011 denial, pursuant to the requirements of California law. (Doc. No. 13-10.)

On January 24, 2012, Petitioner filed a second Petition for Writ of Habeas Corpus in the California Court of Appeal. (Doc. No. 13-11.) On February 28, 2012, the Court of Appeal denied the Petition. (Doc. No. 13-12.)

On February 5, 2012, Petitioner filed a Petition for Review in the California Supreme Court. (Doc. No. 13-13.)[7/] On June 13, 2012, the California Supreme Court denied the Petition without comment. (Doc. No. 13-14.)

On June 24, 2012, Petitioner constructively[8/] filed a Petition for Writ of Habeas Corpus in this Court. (Doc. No. 1.) On April 29, 2013, Respondent filed a

---

[4/] The Court gives Petitioner the benefit of the "mailbox rule" which deems that a petition is constructively filed when it is delivered to prison officials for filing. Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379 (1988).

[5/] See footnote 2.

[6/] See footnote 2.

[7/] It appears that Petitioner filed his Petition in the California Supreme Court on February 5, 2012, before the Court of Appeal had ruled (on February 28, 2012) on his Petition filed in that court.

[8/] See footnote 2.

12cv1708

Motion to Dismiss. (Doc. No. 10.) On June 25, 2013, Petitioner filed an Opposition to the Motion to Dismiss. (Doc. No. 18.) On August 1, 2013, Respondent filed a Response to Petitioner's Opposition to the Motion to Dismiss. (Doc. No. 20). On August 7, 2013, Petitioner filed a Reply to Respondent's Response. (Doc. No. 22.)

On August 13, 2013, this Court issued an R&R, recommending the dismissal of the Petition as untimely. (Doc. No. 23.) On September 3, 2013,  Petitioner filed a Motion to Expand the Record to include a page omitted by Respondent as to a petition filed by Petitioner in the California Court of Appeal, in addition to an objection to the R&R. (Doc. Nos. 24-25.) On October 25, 2013, Judge Hayes issued an order adopting the R&R in part and not adopting it in part. (Doc. No. 26.) On the same date, this Court issued  an Order Requiring a Response to the original Petition. (Doc. No. 27.) On November 20, 2013, Respondent filed an Answer to the Petition for Writ of Habeas Corpus. On January 13, 2014, Petitioner filed the Traverse to Respondent's Answer. (Doc. No. 29; Doc. No. 31.)

## IV

## APPLICABLE LAW

Title 28, United States Code § 2254, as amended by the Antiterrorism and Effective Death Penalty Act's ("the AEDPA") applies to all petitions for writs of habeas corpus filed in federal court after the AEDPA's effective date of April 24, 1996. Lindh v. Murphy, 521 U.S. 320, 336, 117 S. Ct. 2059, 2068 (1997).  Since the Petition was filed on June 24, 2012, the AEDPA applies to this case. Section 2254 sets forth the following scope of review for federal habeas corpus claims:

As amended, 28 U.S.C. § 2254(d) states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

12cv1708

1

2          (2) resulted in a decision that was based on an <u>unreasonable determination</u> of the
           facts in light of the evidence presented in the State court proceeding.  28 U.S.C. §
3                            2245(d)(1)-(2) (emphasis added).
              "AEDPA establishes a 'highly deferential standard for evaluating state-court

4    rulings, which demands that state-court decisions be given the benefit of the doubt.'"

5    <u>Womack v. Del Papa</u>, 497 F.3d 998, 1001 (9th Cir. 2007); <u>quoting</u> <u>Woodford v.</u>

6    <u>Viscotti</u>, 537 U.S. 19, 24, 123 S.Ct. 357 (2002).   To obtain federal habeas relief,

7    Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). <u>See</u> <u>Williams v. Taylor</u>, 529

8    U.S. 362, 403, 120 S.Ct. 1495, 1517 (2000).  The Supreme Court has ruled that the

9    "contrary to" clause of § 2254(d)(1) permits a grant of habeas relief "if the state court

10   arrives at a conclusion opposite to that reached by this Court on a question of law or if

11   the state court decides a case differently than this Court has on a set of materially

12   indistinguishable facts."  <u>Id.</u> at 412-13.  The Supreme Court has also interpreted the

13   "unreasonable application" clause of § 2254(d)(1) to allow a grant of "the writ if the

14   state court identifies the correct governing legal principle from this Court's decisions

15   but unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at 413.

16   The Supreme Court has clarified that under § 2254(d)(2), even an erroneous or incorrect

17   application of clearly established federal law does not support a habeas grant, unless the

18   state court's application was "objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S.

19   63, 75, 123 S.Ct. 1166, 1174 (2003).

20          The California Supreme Court denied Petitioner's Petition for Habeas Corpus

21   containing the claim without comment. (Doc. No. 13-14.) In this circumstance, a federal

22   court looks "to the last reasoned decision of the state court," here the California Court

23   of Appeal, as the basis for the state court's judgment. <u>Womack v. Del Papa</u>, 497 F.3d

24   998, 1002 (9th Cir. 2007); <u>quoting</u> <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1233 n.3 (9th

25   Cir. 2002). "Where there has been one reasoned judgment rejecting a federal claim,

26   later unexplained orders upholding that judgment or rejecting the same claim rest upon

27   the same ground." <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594(1991-

28   ); <u>Shackleford v. Hubbard</u>, 234 F. 3d 1072, 1079 n.2 (9th Cir. 2000).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V

<u>DISCUSSION</u>

Petitioner argues that appellate counsel was ineffective for failing to raise instructional error as to the § 11370.4 weight enhancements, arguing that the enhancements were illegal because the jury was not instructed that he had "substantial knowledge in the weight of the cocaine." Addressing the state appellate's court's decision, the Petitioner argues that: 1) it was contrary to and an unreasonable application of established federal law; 2) the court did not address Petitioner's claim that due process requires a *mens rea* requirement for statutory criminal offenses that the legislature did not intend to be regulatory; and 3) since appellate counsel failed to raise the knowledge issue, the state appellate court unreasonably applied <u>Strickland v.</u> <u>Washington</u>, 466 U.S. 668 (1984).

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is <u>Strickland.</u>  <u>See</u> <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1323 (9th Cir. 1996).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must consider two factors.  <u>Strickland</u>, 466 U.S. at 687.  First, the Petitioner must show that counsel's performance was deficient.  <u>Id.</u>  Deficient performance requires a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  <u>Id.</u>  The Petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  <u>Id.</u> at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  <u>Strickland</u>, 466 U.S. at 689. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  <u>Id.</u> at 687.

The second prong requires Petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

12cv1708

would have been different." <u>Strickland</u>, 466 U.S. at 694. The <u>Strickland</u> court stated that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or to even address both components of the inquiry if the [Petitioner] makes an insufficient showing on one." <u>Id.</u> at 697.

However, in 2005, the United States Supreme Court stated that in a situation where the state courts address one prong of the two-prong <u>Strickland</u> test for ineffective assistance of counsel, but not the other, federal courts apply AEDPA deference to the prong the state courts reached, but review the unaddressed prong *de novo*.  <u>Harris v. Thompson</u>, 698 F.3d 609, 625 (7th Cir. 2012); <u>citing</u> <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005) (*de novo* review where state courts did not reach prejudice prong).

In 2011, the United States Supreme Court explained that it does not matter "whether or not the state court reveals which one of the elements in a multipart claim it found insufficient" because the relevant question is whether a "'claim,' not a component of one, has been adjudicated." <u>Harrington v. Richter</u>, _ U.S. _, 131 S. Ct. 770, 784 (2011). This language appears to directly conflict with that of <u>Rompilla</u>. <u>See, e.g.</u>, <u>Childers v. Floyd</u>, 642 F.3d 953, 969 n.18 (11th Cir. 2001) (*en banc*) ("Language in [<u>Richter</u>], however, suggests that this portion of <u>Rompilla</u> may no longer be good law."). The Ninth Circuit has not yet resolved this issue. The Seventh Circuit has addressed the conflict by construing <u>Richter</u> to apply only where the state court decision is "unaccompanied by an explanation." <u>Sussman v. Jenkins</u>, 642 F.3d 532, 534 (7th Cir. 2011).[9/]

"In a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court. . ." <u>Strickland</u>, 466 U.S. at 698.  Instead, "it is a mixed question of law and fact." <u>Id</u>, <u>citing</u> <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 342 (1980).  Federal habeas

---

[9/] Since it is unclear whether AEDPA deference applies to the second prong of Petitioner's claims, this Court will review the prejudice element of Petitioner's claims *de novo*. <u>See</u> <u>Berghuis v. Thompkins</u>, _ U.S. _, 130 S. Ct. 2250, 2265 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petition will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review . . . .").

12cv1708

courts must defer to "state court findings of fact made in the course of deciding an ineffectiveness claim."  <u>Strickland</u>, 466 U.S. at 698. The <u>Strickland</u> standard also applies to challenges to counsel's effectiveness on appeal. <u>Smith v. Robbins</u>, 528 U.S. 259, 285, (2000); <u>Evitts v. Lucey</u>, 469 U.S. 387 (1985); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989).

A. <u>APPELLATE COUNSEL'S PERFORMANCE WAS NOT DEFICIENT</u>

The first prong of the <u>Strickland</u> test, deficient performance, requires a showing that counsel's performance was "outside the wide range of professionally competent assistance."  <u>Strickland</u>, 466 U.S. at 690. The relevant inquiry under <u>Strickland</u> is not what defense counsel could have done, but whether counsel's choices were reasonable.  See <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance "must be highly deferential," and the court must guard against the distorting effects of hindsight and evaluate the challenged conduct from counsel's perspective at the time in issue.  <u>Strickland</u>, 466 U.S. at 689; <u>see</u> <u>also</u> <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003) (the first <u>Strickland</u> prong is a "context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time of that conduct."); <u>Karis v. Calderon</u>, 283 F.3d 1117, 1130 (9th Cir. 2002) (court may "neither second-guess counsel's decisions nor apply the fabled twenty-twenty vision of hindsight").

Further, a petitioner bears the heavy burden of demonstrating that counsel's assistance was neither reasonable nor the result of sound strategy.  <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 939 (9th Cir. 2001), <u>cert</u>. <u>denied</u>, 535 U.S. 935 (2002); <u>see</u> <u>also</u> <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir.) (en banc), <u>cert</u>. <u>denied</u>, 522 U.S. 1009 (2007).

12cv1708

A habeas petitioner bears the burden to overcome the presumption that, under the circumstances, the challenged action constituted competent representation. <u>Strickland</u>, 466 U.S. at 689.

> Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under [Section] 2254(d). When [Section] 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Premo v. Moore</u>, __ U.S. __, 131 S.Ct. 733, 740 (2011).

In the last reasoned state court decision, the California Court of Appeal denied Petitioner's ineffective assistance claim reasoning that § 11370.4 does not require proof of the knowledge issue:

> [D]efendants who knowingly possess controlled substances are strictly liable for any weight enhancements regardless of their knowledge of the quantity. (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1748.) The enhancement statute does not criminalize otherwise innocent activity because it incorporates the underlying crime which already contains a mens rea requirement. (*Ibid.*) The Court is not required to instruct the jury on the defendant's actual knowledge of the amount of the controlled substance. (*Id.* at pp. 1747 - 1749.)

(Doc. No. 13-12 at 1-2).

In California, defendants are strictly liable for weight enhancements. The California Court of Appeal has held that "to the extent [<u>People v. Price</u>] ... requires clarification instructions on quantity enhancement, it is overruled. . . *[D]efendants who knowingly possess controlled substances are strictly liable for any weight enhancement regardless of their knowledge of the quantity*." <u>People v. Meza</u>, 38 Cal.App. 4th 1741, 1748 (1995) (emphasis added); <u>overruling</u> <u>People v. Price</u>, 210 Cal.App.3d. 1183 (1989).

> The issue of whether a court must instruct on knowledge under section 11370.4 was presented in <u>People v. Price</u> (1989) 210 Cal.App.3d 1183. Price was convicted of transporting cocaine, possessing cocaine for sale and conspiring to commit these crimes as an aider and abettor. The jury also found true an allegation the cocaine exceeded 10 pounds under a prior version of section 11370.4 which imposed weight enhancements measured in pounds rather than kilograms. (See Stats. 1992, ch. 680, A§ 1.) Price argued the trial court was obligated to instruct the jury it could not find the enhancement allegation true unless it found he either actually knew the quantity of cocaine or specifically intended to possess the quantity

involved. (210 Cal.App.3d at p. 1192.) We rejected this argument. -
[S]ection 11370.4 ... requires only a conviction under section 11351
or 11352, among others. Then, where 'the substance exceeds 10
pounds,' the enhancement is imposed. No special intent or knowledge
is required under the statute .... (210 Cal.App.3d at pp. 1193-1194.)

Meza, 38 Cal.App.4th at 1747-48.

Under the state statutory scheme, the weight enhancement at issue "shall not be imposed unless the trier of fact finds that the defendant conspirator was substantially involved in the planning, direction, execution, or financing of the underlying offense." § 11370.4(a). The Legislature specifically provided for enhancements where a "person [has been] convicted of a violation of, or of a conspiracy to violate [§§] 11351, 11351.5, or 11352 with respect to a substance containing . . . cocaine." Id.

In order to find true the weight allegation enhancement, Petitioner's jury had to first find beyond a reasonable doubt that he had the specific intent to agree to conspire, the specific intent to commit the charged crimes, and that he was substantially involved in the planning, direction, execution, or financing of the underlying offense. (Doc. No. 30-16 at 215-36.) Since the jury reached a unanimous guilty verdict, the requirement that Petitioner had knowledge of the presence of the controlled substance was satisfied. Meza, 38. Cal.App.4th at 1746 ("Transportation of a controlled substance is established by carrying or conveying a usable quantity of a controlled substance with knowledge of its presence and illegal character.") Having determined Petitioner was guilty, the jury went on to consider the weight enhancements which it found were satisfied as to each count by virtue of its true findings. (Doc. No. 30-16 at 171-82).

Petitioner argues that the California Court of Appeal failed to address his claim that due process required that the *mens rea* requirement be submitted to the jury. (Doc. No. 31 at 3). Petitioner implicitly concedes that Respondent correctly states the law that a failure to "to raise issues on direct appeal does not" constitute ineffective assistance of counsel "when appeal would not have provided grounds for reversal." Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001). An "appellant's counsel's failure to raise

an issue on direct appeal does not constitute ineffective assistance when the appeal would not have provided grounds for reversal." <u>Wildman</u>, 261 F.3d at 840.

Therefore, under the circumstances presented in this case, the Court can not conclude that Petitioner's appellate counsel's choice not to raise the knowledge issue was deficient, or unreasonable given the state of the law in California.

### 1. <u>The Regulatory Nature of § 11370.4 Is Irrelevant</u>

Petitioner argues that § 11370.4 was not intended to be regulatory and that as a result, the absence of a knowledge requirement as to the weight enhancement raises due process concerns. (Doc. No. 31 at 6). Petitioner attempts to undermine the <u>Meza</u> holding by arguing that the Court of Appeal was incorrect in relying on cases that construed federal drug quantity enhancement law. (Id. at 7.) However, the Court of Appeal explained that the "construction of [the (federal) enhancement statute] does not criminalize otherwise innocent activity, since the statute incorporates [the underlying crime] which already contains a mens rea requirement ... In this respect, the ... statute resembles other ... criminal laws, which provide enhanced penalties ... for obviously antisocial conduct upon proof of a fact of which the defendant need not be aware." <u>Meza</u>, 38 Cal.App.4th at 1748; <u>quoting</u> <u>United States v. Falu</u>, 776 F.2d 46, 50 (2d Cir. 1985)

The <u>Meza</u> court compared the federal drug quantity enhancement framework to § 11370.4 by stating that "the same is true where, as here, defendants were convicted of knowingly and intentionally possessing for sale and transporting a large quantity of cocaine as part of a sophisticated drug trafficking operation... '(t)hrough their involvement in the illegal transaction, defendants assume the risk of enhanced penalties.'" <u>Id.</u> at 1748; <u>quoting</u> <u>United States v. Normandeau</u>, 800 F.2d 953, 956 (9th Cir. 1986); <u>overruled on other grounds</u>, <u>U.S. v. Nordby</u>, 225 F.3d 1053, 1060 (9th Cir. 2000) <u>overruled by U.S. v. Buckland</u>, 277 F.3d 1173 (9th Cir. 2002) and <u>U.S. v. Buckland</u>, 289 F.3d 558 (9th Cir. 2002). The Court of Appeal's reliance on cases construing federal drug quantity enhancement law appears to be well reasoned and

entirely appropriate. Thus, the California Court of Appeal's holding that the "absence of a knowledge requirement as to the weight enhancement" does not raise "due process concerns" is clearly correct in this case. Id. at 1748.

Petitioner attempts to further distinguish the purpose of the federal drug quantity enhancement statute and that of § 11370.4 by arguing that while the federal enhancement statute was intended to be regulatory, § 11370.4 was not. (Doc. No. 31 at 7). Petitioner states that the federal purpose is deterrence of "particularly insidious drug transactions, including those involving a particularly addictive form of cocaine base known as 'crack.'" (Id.) [citing United States v. Pineda, 847 F.2d 64, 65 (2d Cir. 1988)]. Further, that Congress wanted the federal enhancement statute to deal more "severely with large-volume . . . [narcotics] dealers." (Doc. No. 31 at 7) (citing United States v. Normandeau, 800 F.2d at 956.)

The Court finds that whether § 11370.4 was, or was not, intended to be regulatory is irrelevant because the underlying purpose for the enactment of the federal and state enhancement statues are almost identical. The Court of Appeal clarified that:

> [S]ection 11370.2 was enacted in 1985. At that same time, section 11370.4, which provides for additional enhancements (three to ten years; amended to include a fifteen-year enhancement) for possession of substances containing heroin or cocaine according to the amount possessed, was enacted. *The express purpose for the enactment of these sections was to punish more severely those persons who are in the regular business of trafficking in, or production of, narcotics and those persons who deal in large quantities of narcotics* as opposed to individuals who have a less serious, occasional, or relatively minor role in this activity. (Assem. Bill No. 2320 (1985 - 1986 Reg.Sess.) ch. 1398, § 1.)

People v. Garcia, 211 Cal. App. 3d 1096, 1100-1101 (1989) (emphasis added); See also, People v. Oakley, 216 Cal. App 4th 1241, 1246-1247 (2013) ("The legislative history states... (I)t is the intent of the Legislature in enacting Sections 3 and 4 of this act to punish more severely those persons... who deal in large quantities of narcotics (Stats. 1985, ch. 1398, § 1, p. 4948). Sections 3 and 4... relate to the enactment of Health and Safety Code sections 11370.4 and 11379.8, respectively, enhancements for excessive quantities of specified controlled substances." (Id.) This near exact language

as to the purpose of the two enhancement statutes shows that even if the regulatory nature of § 11307.4 was relevant, Petitioner's argument that the federal enhancement statute is regulatory supports the same conclusion for § 11370.4.

### 2. The State Appellate Court's Decision  Was Not Contrary To Or An Unreasonable Application Of Established Federal Law

As Petitioner argues, to prevail under 28 U.S.C. § 2254 the state court's adjudication of a claim must result "in a decision that was contrary to... or an unreasonable application of *clearly established Federal law*." 28 U.S.C. § 2254(d)(1) (emphasis added). Section 11370.4 is a state law and does not require proof of  the knowledge issue apart from the underlying crime. However, Petitioner argues that clearly established federal law requires non-regulatory criminal statutes to include a *mens rea* element to comport with federal due process. Petitioner cites Staples v. United States, 511 U.S. 600 (1994) to support his claim. The issue in Staples was whether a violation under a federal statute forbidding possession of unregistered firearms required a showing of a *mens rea*. Staples, 511 U.S. at 619-20. The Supreme Court found in the affirmative. Id. at 619. However, the Staples decision does not have any bearing on the present issue. "We emphasize that our holding is a narrow one. . .  Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not." Id. at 619-20; quoting Morissette v. United States, 342 U.S. 246, 260 (1952).

Further, Petitioner argues that due process requires a criminal offense to have a *mens rea* element, unless public policy requires otherwise. (Doc. No. 31 at 4) (citing Shevlin-Carpenter Co. v. State of Minnesota, 218 U.S. 57, 70 (1910) ("public policy may require that in the prohibition or punishment of particular acts it may be provided that he who shall do them shall do them at his own peril, and will not be heard to plead in defense good faith or ignorance.") However, in the case upon which Petitioner relies, the Supreme Court agreed with the Minnesota Supreme Court in that the legislature has the power to "adjust legislation to evils as they arise," and reasoned that though "such

12cv1708

legislation may... be harsh... this court cannot set aside legislation because it is harsh." Id. at 69-70. Here, the California legislature used its power to combat the evils of narcotics distribution by enacting § 11370.4, and enforcement of this legislation did not result in any unreasonable application of federal law in this case.

Moreover, the Shevlin court reasoned that since the law that was violated was an existing law, the violation was "a legal wrong, not an innocent act," and that ignorance could not be claimed because the plaintiffs were aware of the "risk and consequences of transgression." Id. at 69. Similarly, here, § 11370.4 was in effect when Petitioner committed his crimes. Thus, any claim of ignorance of as to the strict liability nature of the weight enhancements fails.

### B. PETITIONER'S COUNSEL MADE A RATIONAL DECISION TO NOT RAISE INSTRUCTIONAL ERROR AS TO THE § 11370.4 WEIGHT ENHANCEMENTS

Petitioner claims that "[i]f appellate counsel had raised the weight enhancement issue, there is a reasonable probability that [he] would have received a reversal of the section 11370.4 finding . . . ." (Doc. No. 31 at 9.) While this Court strongly disagrees that reversal was probable, upon de novo review, this Court finds that Petitioner was not prejudiced by Petitioner's appellate counsel's decision not to raise instructional error.

The jury was instructed to only consider § 11370.4 weight enhancements if they found "the [Petitioner] guilty of the crimes charged in Counts 1 through 6, inclusive." (Doc. No. 30-16 at 236.) Further, the jury was instructed to decide "whether, for each crime, the People have proved the additional allegation that the crime involved more than a specified amount or more of the controlled substance... To prove this allegation, the People must prove that the [Petitioner] possessed or transported more than 20 kilograms by weight or more of a substance containing cocaine;... The People have the burden of proving each allegation beyond a reasonable doubt." (Id.) [10]

---

[10] For Counts 7 through 12, the jury instruction was nearly identical but substituted the higher weight requirement of 40 kilograms. (Doc. No. 30-16 at 237.)

The Court of Appeal reversed Petitioner's convictions on Counts 2,4,5, 6, 8, 10, 11 and 12, leaving intact Petitioner's convictions on Counts 1, 3, 7 and 9. (Doc. No. 30-22 at 22-23.) As to Counts 1, 3 and 7, the jury was instructed that to "prove that the [Petitioner] is guilty... the People must prove that: 1) The [Petitioner] possessed a controlled substance; 2) The [Petitioner] knew of its presence; 3) The [Petitioner] knew of the substance's nature or character as a controlled substance; 4) When the [Petitioner] possessed the controlled substance, he intended to sell it; 5) The controlled substance was cocaine." (Doc. No. 30-16 at 219.) Further, the jury was instructed that to find Petitioner guilty of transportation as to Counts 3 and 9, the People must prove that Petitioner "transported, offered to transport or distribute or distributed a controlled substance" that the Petitioner "knew of its presence," "knew of the substance's nature or character as a controlled substance," and transported with "the intent to sell or distribute" the controlled substance. (Id. at 222.)

The jury unanimously rendered a guilty verdict on all counts. "The Court presumes that the jury followed the instructions given by the trial court." See Weeks v. Angelone, 528 U.S. 225, 234 (2000). The jury could only have found true the § 11370.4 weight enhancements if they decided that the People proved, beyond a reasonable doubt, that the Petitioner had the requisite intent to commit the underlying crime, and the necessary quantity, also beyond a reasonable doubt. Petitioner's appellate counsel did not err by not raising instructional error because counsel is never required to raise arguments regarding jury instructions based on erroneous statements of law. See Smith, 528 U.S. at 288, Wildman, 261 F.3d at 840.

As a result of the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED.

VI

CONCLUSION AND RECOMMENDATION

22

12cv1708

After a review of the record in this matter, the undersigned Magistrate Judge **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice.

This report and recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provision of 28 U.S.C. Section 636(b)(1).

**IT IS ORDERED** that no later than <u>May 30, 2014</u>, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>June 13, 2014</u>. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  April 30, 2014


_____
Hon. William V. Gallo
U.S. Magistrate Judge